JUDGE - L. HUNT
CHAPTER 7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____

IN RE:                                    )
                                          )
        JOSEPH J. GABLER                   )      No. 16 B 36131
        SHEILA M. GABLER                   )
                                          )
                        Debtors           )
_____

Colleen Lamb-Ferrara, in her capacity as:        )
(i) one of the successor co-trustees of the      )
Matthew J. Lamb Trust dated June 17, 1992        )
(as amended and restated on December 18,         )
2008); (ii)  one of the successor co-trustees    )
of the Rosemarie Lamb Trust dated                )
June 17, 1992 and any amendments thereto;        )
 (iii) co-executor of the Estate of Rosemarie Lamb,  )
deceased and (iv) as President                   )
of the Lamb Family Foundation, Inc.; and         **)**
Rosemarie Lamb, in her capacity as:              )
(i) one of the successor co-trustees of the      )
Matthew J. Lamb Trust dated June 17, 1992        )
(as amended and restated on December 18,         )
2008); (ii)  one of the successor co-trustees    )
of the Rosemarie Lamb Trust dated                )
June 17, 1992 and any amendments thereto;        )
and (iii) co-executor of the Estate of           )
Rosemarie Lamb                                   )
                        Plaintiff,               )
                                                 )
        v.                                       )   Adversary No. _____
                                                 )
Sheila M. Gabler**,**                            )
                                                 )
                        Defendant.               )
_____

## ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

NOW COMES Colleen Lamb-Ferrara, in her capacity as: (i) one of the successor co-trustees of the Matthew J. Lamb Trust dated June 17, 1992 (as amended and restated on December 18, 2008) ("Matt's Trust"); (ii)  one of the successor co-trustees of the Rosemarie Lamb Trust dated June 17, 1992 and any amendments thereto; (iii) co-executor of the Estate of Rosemarie Lamb; and (iv) as President of the Lamb Family Foundation, Inc. (collectively "Colleen") and Rosemarie Lamb, in her capacity as: (i) one of the successor co-trustees of the Matthew J. Lamb Trust dated June 17, 1992 (as amended and restated on December 18, 2008) ("Matt's Trust"); (ii)  one of the successor co-trustees of the Rosemarie Lamb Trust dated June 17, 1992 and any amendments thereto; (iii) co-executor of the Estate of Rosemarie Lamb (collectively "Rosemarie") (Colleen and Rose are collectively the "Plaintiffs"), by and through her Attorneys, Michael T. Huguelet, P.C., and complains of Debtor/Defendant, Sheila M. Gabler (hereinafter "Gabler" or "Defendant") as follows:

## PARTIES

1.      Colleen Lamb-Ferrara is an individual, who at all relevant times, was a resident of the County of Lake, State of Illinois.

2.      Rosemarie Lamb is an individual, who at all relevant times, was a resident of the County of Lake, State of Illinois.

3.      Sheila M. Gabler is an individual, who at all relevant times, was a resident of the County of Will, State of Illinois, but on information and belief resides in Lake County, Illinois.

## JURISDICTION AND VENUE

4.      On or about November 12, 2016, Gabler filed her individual voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, Case No. 16 B 36131.

5.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(I).  This is an adversary proceeding brought under Federal Rule of Bankruptcy Procedure 7001 which the Plaintiffs are seeking a determination as to the dischargeability of debts under Bankruptcy Code §523.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## FACTS APPLICABLE TO ALL COUNTS

7.      During her lifetime, Rosemarie Lamb ("Rose") was married once to Matthew J. Lamb (hereinafter "Matthew").

8.      Rose and Matthew had four (4) children: Colleen Lamb-Ferrara, Rosemarie Lamb, Matthew Lamb, and Sheila Gabler.

9.      In or around 1992, Matthew and Rose each formed living trusts for estate planning purposes entitled the Matthew J. Lamb Trust dated June 17, 1992 as amended (hereinafter the "Matthew Trust"), and the Rosemarie Lamb Trust dated June 17, 1992 (as amended and restated on December 18, 2008) respectively (hereinafter the "Rose Trust").

10.      Additionally, in connection with her estate planning, Rose executed a Florida Durable Power of Attorney (the "POA") authorizing her spouse, Matthew, as her attorney-in-fact

3

while he was alive, and Gabler as her successor attorney-in-fact upon the death of Matthew. (A true and correct copy of the POA is attached as Exhibit A.)

11.     On February 18, 2012, Matthew died.

12.     At the time of his death, Matthew and Rose were residents of Florida.

13.     At the time Matthew died, he, Rose and her respective trusts owned interests in various assets including but not limited to a (i) William Blair brokerage account, (ii) condominium commonly known as 180 East Pearson, Unit 3901, Chicago, Illinois 60611 (the "Illinois Property"); (iii) condominium commonly known as 799 W. Ocean Drive, Unit B, Key Colony Beach, Florida 33051 (the "Florida Property"); and, (iv) real property commonly known as 3640 Bieneman Road, Burlington, Wisconsin 53105 (the "Wisconsin Property").

14.     After Matthew's death, Gabler became Rose's successor attorney-in-fact pursuant to the POA.

15.     On information and belief, subsequent to Matthew's death, Gabler, without authority, began to withdraw funds from the William Blair brokerage account to pay for numerous personal expenses incurred by Gabler including, but not limited to, expensive trips overseas to both Europe and the Middle East.

16.     After depleting funds in the William Blair brokerage account, Gabler sought financing to sustain her lavish lifestyle and the continued pursuit of her own personal ventures.

A.      **First Bank of Evanston Loan.**

17.     Upon information and belief, subsequent to Matthew's death, Gabler approached First Bank of Evanston ("First Bank") and discussed the need for a loan to fund personal ventures.

4

18.     At all relevant times, Rose was unaware of Gabler's personal ventures or the fact she was applying for financing with First Bank.

19.     Upon information and belief, First Bank agreed to provide Gabler a loan in order to finance her personal ventures, however, First Bank required collateral to secure the loan.

20.     Upon information and belief, Gabler did not have sufficient collateral to secure a loan.

21.     Therefore, unbeknownst to Rose, Gabler pledged the Illinois Property as collateral and First Bank structured a loan to Rose.

22.     The Illinois Property was titled in the name of Rose and at all relevant times had no liens of record against it.

23.     On or about July 6, 2012, First Bank lent $870,000.00 to Gabler under the guise of a home equity loan to Rose ("First Bank Loan") and evidenced by a certain mortgage and promissory note dated July 8, 2012 in the principal amount of $870,000.00 (the "First Bank Note").  (A true and correct copy of the First Bank Note and First Bank Mortgage are attached hereto as Exhibit B).

24.     At closing, Gabler signed Rose's name to the First Bank Note, the First Bank Mortgage and other loan documents required by First Bank by using the POA.

25.     Thereafter, on or about July 11, 2012, the proceeds from the First Bank Loan were disbursed to Gabler.

26.     Gabler proceeded to drawn down the $870,000.00 available on the home equity line of credit, used the funds for her personal use and Gabler failed to pay it off.

27.      On or about May 30, 2014, First Bank filed a foreclosure complaint in the Circuit Court of Cook County, Illinois, case # 14 CH 9177, seeking to foreclose upon the Illinois Property and sought a deficiency on the First Bank Note.

28.      As a result of the First Bank foreclosure lawsuit, Rose was forced to sell the Illinois Property in an effort to repay the First Bank Loan.

29.      The Illinois Property was sold and First Bank obtained a judgment against Rose in the amount of $119,620.52.

30.      Having depleted the funds from the First Bank Loan, Gabler needed additional funds for personal ventures, as well as funds to pay her other creditors including First Bank.

B.      **BCL Capital Funding Loan**

31.      Due to the fact that Gabler needed additional funds to support her lifestyle and personal ventures, and having depleted the funds from the First Bank Loan, in or around September 2013, Gabler approached BCL Funding, LLC ("BCL") seeking another loan.

32.      On information and belief, Gabler applied for a loan from BCL, but did not have sufficient collateral to qualify for a loan.

33.      On information and belief, Gabler, knowing her mother was unaware of the First Bank Loan, and further not wanting to disclose her personal ventures to her mother, Gabler advised BCL and its attorneys of the assets of Rose and that Gabler had a power of attorney authorizing her to sign any loan documents on behalf of Rose.

34.      As part of the loan transaction, BCL required Rose, and her Trust to also execute the loan documents prepared by BCL.

35.     Neither BCL nor Gabler notified Rose or discussed with Rose, the BCL Loan or the proposed encumbrances to be recorded against various properties, none of which were owned by Gabler.

36.     On September 20, 2013, Gabler appeared at the closing of the BCL loan transaction ("BCL Loan") and executed the BCL loan documents drafted by BCL's attorneys including a promissory note in the principal amount of $400,000.00 ("BCL Note"), three separate mortgages recorded against the Illinois Property, the Wisconsin Property and the Florida Property (collectively the "BCL Mortgages"), and a Loan Agreement (the BCL Note, the BCL Mortgages and the Loan Agreement are collectively hereinafter the "BCL Loan Documents"). (True and correct copies of the BCL Loan Documents are attached hereto as Exhibit C).

37.     Gabler signed each of the BCL Loan Documents where indicated in her individual capacity and further bound Rose (owner of the Illinois Property), the Rose Trust (owner of the Florida Property) by signing Rose's name to the BCL Loan Documents on behalf of each of the aforementioned.

38.     At closing and after deducting various closing costs, BCL wired $371,089.00 to Gabler.

39.     Gabler withdrew all of the BCL Loan proceeds.

40.     On March 20, 2014, the BCL Loan matured and Gabler again failed to repay the amounts borrowed.

41.     Gabler utilized the POA for her own benefit and to the detriment of Rose by pledging collateral owned by Rose, and the Rose Trust as consideration for loan proceeds; all of

which she took and spent for her own personal use, and in no way benefited Rose or the Rose Trust.

42.     In or about February 2014, BCL filed three separate foreclosure complaints: (i) in the Circuit Court of Cook County, Illinois, case # 14 CH 2323 to foreclose upon the Illinois Property; (ii) in the Circuit Court of Sixteenth Judicial Circuit, Monroe County, Florida, case # 2014 CA 69M to foreclose upon the Florida Property; and the Circuit Court of Racine County, Wisconsin, case # 14 CV 878 to foreclose upon the Wisconsin Property.

43.     As a result of the three separate foreclosure complaints filed along with the First Bank Loan lawsuit, Rose was forced to sell the Illinois Property, the Wisconsin Property and the Rose Trust has been forced to sell Florida Property in an effort to repay the BCL Loan.

44.     Due to the exorbitant interest rate charged on the outstanding balance due BCL, Rose also repaid BCL in excess of $710,000.00 in connection with the BCL Loan from the proceeds of the forced sales of the Illinois, Wisconsin and Florida Properties.

45.     At all relevant times herein, Rose had a valid Florida Durable Power of Attorney naming Gabler as her attorney in fact.

46.     Pursuant to the Power of Attorney, Gabler was required to act in the best interests and for the well-being of Rose.

47.     Prior to Gabler's executing the First Bank Loan Documents and the BCL Loan Documents, there were no liens against the Illinois Property, the Wisconsin Property and the Florida Property.

48.     Gabler's wrongful actions in borrowing funds from First Bank or BCL by using the Power of Attorney, caused the losses suffered by Rose including being forced to sell the Illinois

8

Property, the Wisconsin Property and the Florida Property to satisfy, in part, the obligations owed to First Bank or BCL.

C.    W**illiam Blair & Company Account (Rose)**

49.    On or about the date of Matthew Lamb's death, Rose owned an investment account with William Blair & Company.

50.    The value of the William Blair & Company Account (the "Blair Account") on or about the date of Matthew Lamb's death was approximately $509,805.85.

51.    Gabler liquidated without authorization and withdrew funds belonging to Rose from a William Blair account totaling in excess of $500,000.00.

52.    Upon information and belief, Gabler utilized the William Blair & Company Account funds to pay for numerous personal expenses incurred by Gabler including, but not limited to, expensive trips overseas to both Europe and the Middle East.

53.    Rose did not use the funds in the William Blair & Company Account, nor where they used for her benefit.

D.    W**illiam Blair & Company Account (Matthew's Trust)**

54.    On or about the date of Matthew Lamb's death, Matthew's Trust owned an investment account with William Blair & Company.

55.    Gabler liquidated without authorization and withdrew funds belonging to Matthew's Trust from a William Blair account totaling in excess of $2,000,000.00.

56.     Upon information and belief, Gabler utilized the William Blair & Company Account funds to pay for numerous personal expenses incurred by Gabler including, but not limited to, expensive trips overseas to both Europe and the Middle East.

57.     Matthew's Trust did not use the funds in the William Blair & Company Account, nor where they used for its benefit or for the beneficiaries of Matthew's Trust.

F.     **Florida Probate – Estate of Matthew J. Lamb**

58.     Subsequent to Matthew Lamb's death, on or about April 4, 2012, a petition was filed in the Circuit Court of Sixteenth Judicial Circuit for Monroe County, Florida as case number CP-M-2012-19 to open his estate, and Rose was appointed the independent personal representative for the Estate.

59.     The Petition also sought to probate the last will and testament (the "Will") of Matthew.

60.     Contained within the terms of the Will, Matt provided the contents of his Estate to pour over into the Matthew Trust.

61.     Thereafter, on or about August 20, 2012, Rose purportedly resigned as personal representative for the Estate and Gabler was thereafter appointed as the personal representative by the Florida Court.

62.     Since Gabler's appointment and continuing for a period of approximately 3-1/2 years, Gabler failed to account to the Court and the Trustee of the Matthew Trust.

63.     When ordered by the Court to appear and explain why the Estate was not closed, Gabler and her attorneys would advise the Court that they were waiting on the letter of clearance from the IRS regarding the filing of the 706 estate tax return.

64.     However, Gabler and her attorneys misrepresented the delay to the Court as the attorneys for the Estate had previously received the letter from the IRS.

65.     These misrepresentations allowed Gabler to continue to remain in control of the assets of the Estate, including over 11,000 pieces of artwork.

66.     Instead of transferring the Estate assets to the Matthew Trust as prescribed by the terms of the Will, Gabler utilized the assets of the Estate for her own personal benefit.

67.     The beneficiaries of the Estate were unaware of the actions taken by Gabler including, but not limited to, the deliberate encumbering and wasting of the assets of the Estate.

68.     Upon discovering that despite her fiduciary obligations as executor of the Estate, Gabler continued to waste the Estate assets, the Trustees of the Matthew Trust petitioned to Court to have her removed as executor of the Estate and compel her to file an accounting for the Estate.

69.     Ultimately, after being ordered the Court, Gabler filed her Final Accounting for the Estate.  (A true and correct copy of the Final Accounting is attached hereto as Exhibit D.)

70.     By her own admissions in the Final Accounting of the Estate, Gabler encumbered the assets of the Estate and incurred numerous loans and unnecessary expenses which had no benefit to the Estate, including but not limited to:

(a)     payments to Emirates General Trading;

(b)     Loans from One-Seven, LLC ($40,000.00), TRAC Financial Services ($115,000.00), Kulvinder Kaur ($50,000.00), Steve McCall ($72,200.00), Discount Now Corp. ($115,000.00)

(c)     Payment to Emperor Global Enterprises for sale of artwork;

(d)     Payment of travel expenses to Europe and US cities;

11

(e)      Payments to numerous entities and persons completely unrelated to the Estate administration totaling approximately $1,342,924.50;

(f)      Outstanding debts owed to numerous entities and persons completely unrelated to the Estate administration totaling $5,176,920.91.

71.      Upon information and belief based on the Final Accounting, Gabler personally received the money allegedly borrowed by the Estate and failed to either turn it over to the Estate or use the money for the benefit of the Estate.

72.      There existed no reason that the Estate assets should have not been distributed as the letter of clearance with respect to the US Estate Tax Return (Form 706) was received by the Estate and the only claim that was filed was dismissed by the Florida Court.  There were no other claims the Estate was obligated to pay as the time for filing claims in the Probate Court had passed.

73.      There existed no valid reason for Gabler in her capacity as personal representative to incur the expense or obligations set forth on the Final Accounting for the Estate.

74.      On or about April, 2019, the Florida Probate Court, acting on the Petition to Remove Gabler as the personal representative, granted said Petition and found her in contempt of Court. (A true and correct copy of the Order is attached hereto as Exhibit E).

75.      Subsequent thereto, on multiple occasions counsel for Colleen Lamb-Ferrara, the successor personal representative for the Estate of Matthew Lamb demanded an amended accounting of the Estate since 2017 and requested documents from Gabler and her attorney concerning the accounting of the Estate.  To date, these documents have not been forthcoming and no accounting has been filed pursuant to statute.

76.    Subsequent to her appointment, Gabler failed to appropriately act in her capacity as personal representative of the Estate, including, but not limited to: (i) failing to comply with Court Orders; (ii) failing to properly account; (iii) wasting Estate assets including withdrawing money from accounts and selling pieces of artwork created by decedent and  owned by entities of which the Estate is the sole shareholder, for her own personal gain.

G.     **Illinois Probate – Estate of Rosemarie Lamb**

77.    On or about January 16, 2017 Rose died.

78.    Subsequent to Rose's death, on or about February 10, 2017, a petition was filed in the Circuit Court of Nineteenth Judicial Circuit for Lake County, Illinois as case number 17P159 to open her estate, and Colleen was appointed the independent Executor for the Estate.

COUNT I - FIRST BANK LOAN DEBT
SECTION 523(a)(6)

79.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-75 of this Complaint as if fully restated herein.

80.    Section 523(a)(6) states that a Debtor should not be granted a discharge from a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

81.    Gabler deliberately took out the First Bank Loan without the knowledge or consent of Rose.

82.    Gabler received the proceeds from the First Bank Loan, and spent them for her own personal use, and then failed to repay the amounts owed.

13

83.     Gabler through her actions perpetrated a fraud upon Rose by deliberately executing the First Bank Loan documents without the knowledge or consent of Rose and withdrawing the loan proceeds for her own personal use.

84.     Gabler intentionally concealed the First Bank Loan from Rose.

85.     Gabler suppressed and concealed certain material facts relating to the First Bank Loan for Rose which she had a duty to disclose to Rose.

86.     Gabler failed to inform Rose at any time of the First Bank Loan.

87.     In particular, Gabler knew and concealed from Rose the following:

   a.     The application for the loan with First Bank;

   b.     The use of the POA to execute the First Bank Loan Documents;

   c.     The signing of Rose's name to each of the First Bank Loan Documents;

   d.     The encumbering of the Illinois Property by a mortgage relating to the First Bank Loan;

   e.     The receipt of the proceeds from the First Bank Loan;

   f.     The default on the First Bank Loan;

88.     Gabler suppressed and concealed material facts with the intent to induce reliance and to defraud Rose.

89.     Rose relied upon her daughters, including Gabler, to assist her.

90.     At all relevant times, Rose was unaware of the material facts that were suppressed and concealed by Gabler.

91.     Had she been aware of Gabler's actions, Rose would not have authorized or approved the First Bank Loan, Gabler's encumbering the Illinois Property, or the use of the loan proceeds for Gabler's personal use.

92.     Gabler's intentional and fraudulent suppression and concealment, in conjunction with Gabler's failure to repay the First Bank Loan resulted in the foreclosure of the Illinois Property, a forced sale of the Illinois Property and the entry of a personal deficiency against Rose.

93.     Rose's Estate has a claim against Gabler filed on May 25, 2017, and all or part of the debt owed to Rose's Estate from the First Bank of Evanston Loan in an amount not less than $987,623.84, is non-dischargeable within the meaning of Bankruptcy Code 523(a)(6).

## COUNT II - FIRST BANK LOAN DEBT
## SECTION 523(a)(4)

94.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-75 of this Complaint as if fully restated herein.

95.     Section 523(a)(4) states that a Debtor should not be granted a discharge from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;"

96.     Gabler, while acting in her individual and fiduciary capacities under the POA, engaged in a calculated course of conduct to convert and embezzle for her own personal use, funds which were secured by assets belonging to Rose.

97.     Gabler through the First Bank Loan, the fraudulent execution of the First Bank Loan documents and then ultimate default upon the repayment of the First Bank Loan, all without the knowledge and consent of Rose, perpetrated a fraud upon Rose resulting in injury to Rose.

98.     Gabler deliberately took out the First Bank Loan without the knowledge or consent of Rose.

15

99.     Gabler utilized the POA for her own benefit and to the detriment of Rose by pledging collateral owned by Rose as consideration for First Bank Loan.

100.    Gabler received the proceeds from the First Bank Loan and spent them for her own personal use, and then failed to repay the amounts owed.

101.    Gabler through her actions perpetrated a fraud upon Rose by deliberately executing the First Bank Loan documents without the knowledge or consent of Rose and withdrawing the loan proceeds for her own personal use.

102.    Gabler intentionally concealed the First Bank Loan from Rose.

103.    Gabler suppressed and concealed certain material facts relating to the First Bank Loan for Rose which she had a duty to disclose to Rose.

104.    Gabler failed to inform Rose at any time of the First Bank Loan.

105.    In particular, Gabler knew and concealed from Rose the following:

a.      The application for the loan with First Bank;

b.      The use of the POA to execute the First Bank Loan Documents;

c.      The signing of Rose's name to each of the First Bank Loan Documents;

d.      The encumbering of the Illinois Property by a mortgage relating to the First Bank Loan;

e.      The receipt of the proceeds from the First Bank Loan;

f.      The default on the First Bank Loan;

106.    Gabler had a duty to consult with and disclose these material facts as a result of her fiduciary relationship.

107.    Gabler suppressed and concealed material facts with the intent to induce reliance and to defraud Rose.

108.    Rose relied upon her daughters, including Gabler, to assist her.

109.    At all relevant times, Rose was unaware of the material facts that were suppressed and concealed by Gabler.

110.    Had she been aware of Gabler's actions, Rose would not have authorized or approved the First Bank Loan, Gabler's encumbering the Illinois Property, or the use of the loan proceeds for Gabler's personal use.

111.    Gabler owed a fiduciary duty of care, loyalty and good faith to Rose.  Gabler's fiduciary duties included obligations to exercise good business judgment, to act prudently, to discharge her actions in good faith, to act in the best interests of Rose and put the interests of Rose above her own.

112.    Gabler breached her fiduciary duty of care and duty of loyalty by mismanaging the funds lent by First Bank and failing to repay the funds lent by First Bank resulting in the foreclosure of the Illinois Property, a forced sale of the Illinois Property and the entry of a personal deficiency against Rose.

113.    Rose's Estate has a claim against Gabler filed on May 25, 2017, and all or part of the debt owed to Rose's Estate from the First Bank of Evanston Loan in an amount not less than $987,623.84, is non-dischargeable within the meaning of Bankruptcy Code 523(a)(4).

## COUNT III - BCL LOAN DEBT
### SECTION 523(a)(6)

114.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-75 of this Complaint as if fully restated herein.

17

115.    Section 523(a)(6) states that a Debtor should not be granted a discharge from a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

116.    Gabler deliberately took out the BCL Loan without the knowledge or consent of Rose.

117.    Gabler received the proceeds from the BCL Loan and spent them for her own personal use, and then failed to repay the amounts owed.

118.    Gabler through her actions perpetrated a fraud upon Rose by deliberately executing the BCL Loan documents without the knowledge or consent of Rose and withdrawing the loan proceeds for her own personal use.

119.    Gabler intentionally concealed the BCL Loan from Rose.

120.    Gabler suppressed and concealed certain material facts relating to the BCL Loan for Rose which she had a duty to disclose to Rose.

121.    Gabler failed to inform Rose at any time of the BCL Loan.

122.    In particular, Gabler knew and concealed from Rose the following:

    a.    The application for the loan with BCL;

    b.    The use of the POA to execute the BCL Loan Documents;

    c.    The signing of Rose's name to each of the BCL Loan Documents;

    d.    The encumbering of the Illinois Property, the Wisconsin Property and the Florida Property by mortgages relating to the BCL Loan;

    e.    The receipt of the proceeds from the BCL Loan;

    f.    The default on the BCL Loan;

123.    Gabler suppressed and concealed material facts with the intent to induce reliance and to defraud Rose.

124.    Rose relied upon her daughters, including Gabler, to assist her.

125.    At all relevant times, Rose was unaware of the material facts that were suppressed and concealed by Gabler.

126.    Had she been aware of Gabler's actions, Rose would not have authorized or approved the BCL Loan, Gabler's encumbering the Illinois Property, the Wisconsin Property and the Florida Property, or the use of the loan proceeds for Gabler's personal use.

127.    Gabler's intentional and fraudulent suppression and concealment, in conjunction with Gabler's failure to repay the BCL Loan resulted in the foreclosure of the Illinois Property, the Florida Property and Wisconsin Property.

128.    Gabler's failure to repay forced the sale of the Illinois Property, the Florida Property and the Wisconsin Property in order to repay the outstanding debt owed to BCL.

129.    Rose's Estate has a claim against Gabler filed on May 25, 2017, and all or part of the debt owed to Rose's Estate from the BCL Funding Loan in an amount not less than $299,110.10 plus attorney's fees and costs incurred totaling $72,613.22, is non-dischargeable as it is a debt within the meaning of Bankruptcy Code 523(a)(6).

130.    Rose's Trust has a claim against Gabler filed on May 25, 2017, and all or part of the debt owed to Rose's Estate from the BCL Funding Loan in an amount not less than $416,320.95 plus attorney's fees and costs incurred totaling $72,951.14, is non-dischargeable as it is a debt within the meaning of Bankruptcy Code 523(a)(6).

COUNT IV - BCL LOAN DEBT
SECTION 523(a)(4)

131.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-75 of this Complaint as if fully restated herein.

132.    Section 523(a)(4) states that a Debtor should not be granted a discharge from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;"

133.    Gabler, while acting in her individual and fiduciary capacities under the POA, engaged in a calculated course of conduct to convert and embezzle for her own personal use, funds which were secured by assets belonging to Rose and Rose's Trust.

134.    Gabler through the BCL Loan, the fraudulent execution of the BCL Loan documents and then ultimate default upon the repayment of the BCL Loan, all without the knowledge and consent of Rose, perpetrated a fraud upon Rose and the Rose Trust resulting in injury to Rose and the Rose Trust.

135.    Gabler deliberately took out the BCL Loan without the knowledge or consent of Rose.

136.    Gabler utilized the POA for her own benefit and to the detriment of Rose by pledging collateral owned by Rose as consideration for BCL Loan.

137.    Gabler received the proceeds from the BCL Loan and spent them for her own personal use, and then failed to repay the amounts owed.

138.    Gabler through her actions perpetrated a fraud upon Rose by deliberately executing the BCL Loan documents without the knowledge or consent of Rose and withdrawing the loan proceeds for her own personal use.

139.    Gabler intentionally concealed the BCL Loan from Rose.

140.    Gabler suppressed and concealed certain material facts relating to the BCL Loan for Rose which she had a duty to disclose to Rose.

141.    Gabler failed to inform Rose at any time of the BCL Loan.

142.    In particular, Gabler knew and concealed from Rose the following:

    a.      The application for the loan with BCL;

    b.      The use of the POA to execute the BCL Loan Documents;

    c.      The signing of Rose's name to each of the BCL Loan Documents;

    d.      The encumbering of the Illinois Property, the Wisconsin Property and the Florida Property by mortgages relating to the BCL Loan;

    e.      The receipt of the proceeds from the BCL Loan;

    f.      The default on the BCL Loan;

143.    Gabler had a duty to consult with and disclose these material facts as a result of her fiduciary relationship.

144.    Gabler suppressed and concealed material facts with the intent to induce reliance and to defraud Rose.

145.    Rose relied upon her daughters, including Gabler, to assist her.

146.    At all relevant times, Rose was unaware of the material facts that were suppressed and concealed by Gabler.

147.    Had she been aware of Gabler's actions, Rose would not have authorized or approved the BCL Loan, Gabler's encumbering the Illinois Property, the Wisconsin Property and the Florida Property, or the use of the loan proceeds for Gabler's personal use.

148.    Gabler owed a fiduciary duty of care, loyalty and good faith to Rose and the beneficiaries of the Rose Trust.  Gabler's fiduciary duties included obligations to exercise good business judgment, to act prudently, to discharge her actions in good faith, to act in the best interests of Rose and the beneficiaries of the Rose Trust and put the interests of Rose and the beneficiaries of the Rose Trust above her own.

149.    Gabler breached her fiduciary duty of care and duty of loyalty by mismanaging the funds lent by BCL and failing to repay the funds lent by BCL resulted in the foreclosure of the Illinois Property, the Florida Property and Wisconsin Property, as well as a forced sale of the Illinois Property, the Florida Property and Wisconsin Property in order to repay the outstanding debt owed to BCL.

150.    Rose's Estate has a claim against Gabler filed on May 25, 2017, and all or part of the debt owed to Rose's Estate from the BCL Funding Loan in an amount not less than $299,110.10 plus attorney's fees and costs incurred totaling $72,613.22, is non-dischargeable as it is a debt within the meaning of Bankruptcy Code 523(a)(4).

151.    Rose's Trust has a claim against Gabler filed on May 25, 2017, and all or part of the debt owed to Rose's Estate from the BCL Funding Loan in an amount not less than $416,320.95 plus attorney's fees and costs incurred totaling $72,951.14, is non-dischargeable as it is a debt within the meaning of Bankruptcy Code 523(a)(4).

## COUNT V – ESTATE OF MATTHEW LAMB DEBTS
### SECTION 523(a)(6)

152.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-75 of this Complaint as if fully restated herein.

153.    Section 523(a)(6) states that a Debtor should not be granted a discharge from a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

154.    Gabler, in her capacity as personal representative for the Estate of Matthew Lamb deliberately incurred debts and borrowed money utilizing the assets of the Estate of Matthew Lamb for no purpose relating to the administration of the Estate of Matthew Lamb and without the knowledge or consent of the beneficiaries of Matthew Lamb's Estate.

155.    Gabler personally received the proceeds from loans and debts incurred on behalf of the Estate and spent them for her own personal use, and then failed to repay the amounts owed.

156.    Gabler intentionally concealed her actions, including borrowing money and incurring unrelated debts from the beneficiaries of the Estate.

157.    She continues to conceal the location of the funds, account for the funds allegedly borrowed and how they were relevant to Estate administration.

158.    Gabler through her aforementioned actions in incurring the alleged debts of the Estate of Matthew Lamb perpetrated a fraud upon the Estate of Matthew Lamb and its beneficiaries, including Matt's Trust, by deliberately incurring debts and borrowing money utilizing the assets of the Estate of Matthew Lamb for no purpose relating to the administration of the Estate of Matthew Lamb without the knowledge or consent of the beneficiaries of Matthew Lamb's Estate.

159.    Gabler's failure to repay the monies borrowed and used personally have resulted in alleged unsubstantiated debts against the Estate of Matthew Lamb which exceed the value of the assets remaining to be distributed to the beneficiaries, including Matt's Trust.

160.    Matt's Trust and the Lamb Family Foundation filed a claim against Gabler on May 25, 2017, and all or part of the debt owed to Matt's Trust in an amount not less than $6,489,460.47 plus attorney's fees and costs incurred totaling $106,311.07, is non-dischargeable as it is a debt within the meaning of Bankruptcy Code 523(a)(6).

### COUNT VI – ESTATE OF MATTHEW LAMB DEBTS
### SECTION 523(a)(4)

161.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-75 of this Complaint as if fully restated herein.

162.    Section 523(a)(4) states that a Debtor should not be granted a discharge from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;"

163.    Gabler, while acting in her capacity as personal representative for the Estate of Matthew Lamb, deliberately incurred debts and borrowed money utilizing the assets of the Estate of Matthew Lamb for no purpose relating to the administration of the Estate of Matthew Lamb and without the knowledge or consent of the beneficiaries of Matthew Lamb's Estate.

164.    Gabler personally received the proceeds from loans and debts incurred on behalf of the Estate and spent them for her own personal use, and then failed to repay the amounts owed.

165.    Gabler intentionally concealed her actions, including borrowing money and incurring unrelated debts from the beneficiaries of the Estate.

166.    She continues to conceal the location of the funds, account for the funds allegedly borrowed and how they were relevant to Estate administration

167.    Gabler owed a fiduciary duty of care, loyalty and good faith to the Estate of

24

Matthew Lamb and its beneficiaries.  Gabler's fiduciary duties included obligations to exercise good business judgment, to act prudently, to discharge her actions in good faith, to act in the best interests of the Estate of Matthew Lamb and its beneficiaries and put the interests of the Estate of Matthew Lamb and its beneficiaries above her own.

168.    Gabler breached her fiduciary duty of care and duty of loyalty by mismanaging the Estate of Matthew Lamb and by deliberately incurring debts and borrowing money utilizing the assets of the Estate of Matthew Lamb for no purpose relating to the administration of the Estate of Matthew Lamb resulting in alleged debt obligations that exceed the value of the Estate assets.

169.    Gabler's failure to repay the monies borrowed and used personally have resulted in alleged unsubstantiated debts against the Estate of Matthew Lamb which exceed the value of the assets remaining to be distributed to the beneficiaries, including Matt's Trust.

170.    Matt's Trust and the Lamb Family Foundation filed a claim against Gabler on May 25, 2017, and all or part of the debt owed to Matt's Trust in an amount not less than $6,489,460.47 plus attorney's fees and costs incurred totaling $106,311.07, is non-dischargeable as it is a debt within the meaning of Bankruptcy Code 523(a)(4).

## COUNT VII – WILLIAM BLAIR ACCOUNT - ROSE
### SECTION 523(a)(6)

171.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-75 of this Complaint as if fully restated herein.

172.    Section 523(a)(6) states that a Debtor should not be granted a discharge from a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

173.    On or about the date of Matthew Lamb's death, Rosemarie Lamb owned an

investment account with William Blair & Company (the "Rose Blair Account").

174.     Subsequent to Matthew Lamb's death, Gabler, without the authorization of Rosemarie Lamb, liquidated all of the assets in the Rose Blair Account and withdrew the proceeds without the knowledge or consent of Rose.

175.     Gabler used the Rose Blair Account proceeds for her own personal use.

176.     As the Rose Blair Account was in Rose's name, she was absolutely and unconditionally entitled to the Rose Blair Account proceeds.

177.     Demand was made on Gabler that the Rose Blair Account proceeds be repaid, however, Gabler has failed to repay the amounts belonging to Rose.

178.     Gabler failed to pay any of the funds from the Rose Blair Account or account for the funds' whereabouts.

179.     Rose's Estate filed a claim against Gabler on May 25, 2017, and all or part of the debt owed to Rose's Estate for the William Blair Account in an amount not less than $446,320.37, is non-dischargeable as it is a debt within the meaning of Bankruptcy Code 523(a)(6).

COUNT VIII – WILLIAM BLAIR ACCOUNT - ROSE
SECTION 523(a)(4)

180.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-75 of this Complaint as if fully restated herein.

181.     Section 523(a)(4) states that a Debtor should not be granted a discharge from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;"

182.     On or about the date of Matthew Lamb's death, Rosemarie Lamb owned an investment account with William Blair & Company (the "Rose Blair Account").

26

183.    Subsequent to Matthew Lamb's death, Gabler, without the authorization of Rosemarie Lamb, liquidated all of the assets in the Rose Blair Account and withdrew the proceeds without the knowledge or consent of Rose.

184.    Gabler used the Rose Blair Account proceeds for her own personal use.

185.    Gabler intentionally concealed the withdraw and use of the funds in the Rose Blair Account from Rose.

186.    Gabler suppressed and concealed certain material facts relating to funds in the Rose Blair Account for Rose which she had a duty to disclose to Rose.

187.    Gabler failed to inform Rose at any time of the withdrawal and use of the funds in the Rose Blair Account.

188.    In particular, Gabler knew and concealed from Rose the following:

a.      The use of the POA to withdraw the funds in the Rose Blair Account;

b.      The withdraw, depletion and use of the funds in the Rose Blair Account;

189.    Gabler had a duty to consult with and disclose these material facts as a result of her fiduciary relationship.

190.    Gabler suppressed and concealed material facts with the intent to induce reliance and to defraud Rose.

191.    Rose relied upon her daughters, including Gabler, to assist her.

192.    At all relevant times, Rose was unaware of the material facts concerning the withdrawal of the funds in the Rose Blair Account that were suppressed and concealed by Gabler.

193.    Had she been aware of Gabler's actions, Rose would not have authorized or approved withdrawal of the funds in the Rose Blair Account.

194.   Gabler owed a fiduciary duty of care, loyalty and good faith to Rose.  Gabler's fiduciary duties included obligations to exercise good business judgment, to act prudently, to discharge her actions in good faith, to act in the best interests of Rose and put the interests of Rose above her own.

195.   Gabler breached her fiduciary duty of care and duty of loyalty by mismanaging the funds in the Rose Blair Account and failing to repay the funds in the Rose Blair Account.

196.   As the Rose Blair Account was in Rose's name, she was absolutely and unconditionally entitled to the Rose Blair Account proceeds.

197.   Demand was made on Gabler that the Rose Blair Account proceeds be repaid, however, Gabler has failed to repay the amounts belonging to Rose.

198.   Gabler failed to pay any of the funds from the Rose Blair Account or account for the funds' whereabouts.

199.   Gabler's failure to repay the funds in the Rose Blair Account resulted significant losses for Rose.

200.   Rose's Estate filed a claim against Gabler on May 25, 2017, and all or part of the debt owed to Rose's Estate for the William Blair Account in an amount not less than $446,320.37, is non-dischargeable as it is a debt within the meaning of Bankruptcy Code 523(a)(4).

## COUNT IX – WILLIAM BLAIR ACCOUNT – MATT'S TRUST
## SECTION 523(a)(6)

201.   Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-75 of this Complaint as if fully restated herein.

202.   Section 523(a)(6) states that a Debtor should not be granted a discharge from a

debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

203.    On or about the date of Matthew Lamb's death, Matt's Trust owned an investment account with William Blair & Company (the "Trust Blair Account").

204.    Subsequent to Matthew Lamb's death and without the authorization of Matt's Trust, Gabler liquidated all of the assets in the Trust Blair Account and withdrew the proceeds without the knowledge or consent of Matt's Trust or its beneficiaries.

205.    Gabler used the Trust Blair Account proceeds for her own personal use.

206.    As the Trust Blair Account was in Matt's Trust's name, Matt's Trust was absolutely and unconditionally entitled to the Trust Blair Account proceeds.

207.    Demand was made on Gabler that the Trust Blair Account proceeds be repaid, however, Gabler has failed to repay the amounts belonging to Matt's Trust.

208.    Gabler failed to pay any of the funds from the Trust Blair Account or account for the funds' whereabouts.

209.    Gabler's failure to repay the monies borrowed and used personally have resulted in loss of assets belonging to Matt's Trust.

210.    Matt's Trust  and the Lamb Family Foundation, Inc. filed a claim against Gabler on May 25, 2017, and all or part of the debt owed to Matt's Trust in an amount not less than $2,979,928.90 plus attorney's fees and costs incurred totaling $106,311.07, is non-dischargeable as it is a debt within the meaning of Bankruptcy Code 523(a)(6).

COUNT X – WILLIAM BLAIR ACCOUNT – MATT'S TRUST
SECTION 523(a)(4)

29

211.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-75 of this Complaint as if fully restated herein.

212.     Section 523(a)(4) states that a Debtor should not be granted a discharge from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;"

213.     On or about the date of Matthew Lamb's death, Matt's Trust owned an investment account with William Blair & Company (the "Trust Blair Account").

214.     Subsequent to Matthew Lamb's death and without the authorization of Matt's Trust, Gabler liquidated all of the assets in the Trust Blair Account and withdrew the proceeds without the knowledge or consent of Matt's Trust or its beneficiaries.

215.     Gabler used the Trust Blair Account proceeds for her own personal use.

216.     Gabler intentionally concealed the withdraw and use of the funds in the Trust Blair Account from Matt's Trust or its beneficiaries.

217.     Gabler suppressed and concealed certain material facts relating to funds in the Trust Blair Account for Matt's Trust or its beneficiaries which she had a duty to disclose to Matt's Trust or its beneficiaries.

218.     Gabler failed to inform Matt's Trust or its beneficiaries at any time of the withdrawal and use of the funds in the Trust Blair Account.

219.     In particular, Gabler knew and concealed from Matt's Trust or its beneficiaries the following:

    a.     The use of the POA to withdraw the funds in the Trust Blair Account;

    b.     The withdraw, depletion and use of the funds in the Trust Blair Account;

220.    Gabler had a duty to consult with and disclose these material facts as a result of her fiduciary relationship.

221.    Gabler suppressed and concealed material facts with the intent to induce reliance and to defraud Matt's Trust or its beneficiaries.

222.    Matt's Trust or its beneficiaries relied upon Gabler.

223.    At all relevant times, Matt's Trust or its beneficiaries were unaware of the material facts concerning the withdrawal of the funds in the Trust Blair Account that were suppressed and concealed by Gabler.

224.    Had she been aware of Gabler's actions, Matt's Trust or its beneficiaries would not have authorized or approved withdrawal of the funds in the Trust Blair Account.

225.    Gabler owed a fiduciary duty of care, loyalty and good faith to Matt's Trust or its beneficiaries.  Gabler's fiduciary duties included obligations to exercise good business judgment, to act prudently, to discharge her actions in good faith, to act in the best interests of Matt's Trust or its beneficiaries and put the interests of Matt's Trust or its beneficiaries above her own.

226.    Gabler breached her fiduciary duty of care and duty of loyalty by mismanaging the funds in the Trust Blair Account and failing to repay the funds in the Trust Blair Account.

227.    As the Trust Blair Account was in the Trust's name, the Trust was absolutely and unconditionally entitled to the Trust Blair Account proceeds.

228.    Gabler owed a fiduciary duty of care, loyalty and good faith to Matt's Trust and the beneficiaries of the Matt's Trust.  Gabler's fiduciary duties included obligations to exercise good business judgment, to act prudently, to discharge her actions in good faith, to act in the best interests of the beneficiaries of the Matt's Trust.

229.    Demand was made on Gabler that the Trust Blair Account proceeds be repaid, however, Gabler has failed to repay the amounts belonging to Matt's Trust or its beneficiaries.

230.    Gabler failed to pay any of the funds from the Trust Blair Account or account for the funds' whereabouts.

231.    Gabler's failure to repay the monies borrowed and used personally have resulted in loss of assets belonging to Matt's Trust.

232.    Matt's Trust and Lamb Family Foundation, Inc. filed a claim against Gabler on May 25, 2017, and all or part of the debt owed to Matt's Trust in an amount not less than $2,979,928.90 plus attorney's fees and costs incurred totaling $106,311.07, is non-dischargeable as it is a debt within the meaning of Bankruptcy Code 523(a)(4).

> Respectfully Submitted,
> Colleen Lamb-Ferrara and Rosemarie Lamb, in their capacities as: (i) successor co-trustees of the Matthew J. Lamb Trust dated June 17, 1992 (as amended and restated on December 18, 2008); (ii) successor co-trustees of the Rosemarie Lamb Trust dated June 17, 1992 and any amendments thereto; (iii) co-executors of the Estate of Rosemarie Lamb, deceased; and (iv) as President of the Lamb Family Foundation
>
>
> By:    /s/ Christopher S. Fowler
>           One of Their Attorneys

Michael T. Huguelet, P.C.
Christopher S. Fowler
10723 W. 159th Street
Orland Park, IL 60467
(708) 364-7280